IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| STACIA LYNN KERNS | * | |
| --- | --- | --- |
| | * | |
| v. | * | Civil No. CCB-07-1006 |
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | |
| | * | |
| | ****** | |

MEMORANDUM

Plaintiff Stacia Lynn Kerns brought this action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). Her claims arise from an automobile accident caused by the allegedly negligent conduct of Debra Scott ("Scott") that resulted in the death of the plaintiff's husband, Dennis Kerns, Jr. ("Kerns"). The United States now moves to dismiss her claims or for summary judgment on the grounds that Scott was not acting within the scope of her employment at the time of the accident. Kerns has filed a cross-motion for summary judgment or, in the alternative, for certification of questions of law to the Maryland Court of Appeals. The issues have been fully briefed and no oral argument is necessary. *See* Local Rule 105.6. For the reasons stated below, the defendant's motion will be granted, and the plaintiff's motion will be denied.

BACKGROUND

At approximately 9:30 p.m. on June 24, 2005, Scott and Kerns were involved in a traffic accident on Maryland Route 175 near the Fort Meade Army Base in Anne Arundel County, Maryland. Kerns subsequently died from injuries sustained in the accident. The Anne Arundel County Police concluded that the accident was caused by Scott's negligent driving and failure to yield to oncoming traffic when turning left from Route 175 into a parking lot. (*See* Fatal Accident Report, Def.'s Ex. 5.)

1

At the time of the accident, Scott was in Maryland to attend the 99th Regional Readiness Command's ("RRC") Key Volunteer and Staff Training Meeting, which was being held from June 24 to June 26, 2005. (*See* Wilson Email & Meeting Agenda (June 15, 2005) ("Agenda"), Def.'s Ex. 2, at Scott 002.) Scott was invited to attend in her capacity as a contract employee of the RRC. On April 27, 2005, she received an email from her supervisor, Barbara Wilson, regarding the meeting. It discussed three forms of transportation attendees might use to travel from their homes to the Radisson Hotel in Annapolis, Maryland, where the meeting was to take place. They could fly to Baltimore-Washington International Airport ("BWI"). Alternatively, an attendee could drive to the hotel in his or her personal automobile or a rental car. The email suggested that those flying into BWI could travel from the airport to the hotel using the "Super Shuttle," which would cost twenty-nine dollars per person or, "[i]f there [were] sufficient persons flying, a van may be rented for all to travel to the hotel." Those planning to rent a car were instructed to "fill out the registration form accordingly," and all attendees' travel plans were to be "reflected on [their] orders." (25-26 June Key Vol Training Meeting Email Chain ("Wilson Email"), Def.'s Ex. 1, at Scott 007–08.)

Scott received invitational travel orders, dated May 20, 2005, to travel from her home in Pennsylvania to the Radisson Hotel in Annapolis. The orders instructed that "[i]f traveling by non-government procured commercial transportation, the maximum reimbursement will be limited to the least costly service which would have permitted satisfactory completion of the mission." Although they did not specify how Scott was to travel from BWI to the hotel, the orders expressly stated, "Rental car is not authorized." (Scott Travel Voucher, Def.'s Ex. 7, at US 00290.)

On June 24, Scott flew from Pittsburgh International Airport to BWI, landing at approximately 1:06 p.m. (Scott Decl., Def.'s Ex. 9, ¶ 3.) She could not check into the Radisson until 4:00 p.m., and there were no events related to the meeting scheduled for that day. (Wilson Email at Scott 008; Agenda at Scott 002.) Prior to the flight, Scott had a conversation with Barbara Wilson and Thomas Cannon, a coworker, in which they asked Scott if she would like to rent a car or be listed as a driver on one of their rental cars. (Wilson Dep. 33:4–33:8, June 11, 2010; Cannon Dep. 20:13–20:18, Apr. 14, 2010.) Wilson reports that Scott declined because she was going to "do her own thing with her own rental car." (Wilson Dep. 33:10–33:11; *see also id.* at 68:18–68:21.) After her flight landed, Scott picked up a rental car from Alamo Rent-a-Car; in order to receive the government rate, she had previously reserved the vehicle through the Carlson Wagonlit travel office at Fort Dix. (Scott Dep. 57:1–57:13, Apr. 14, 2010.) Scott paid for the rental car, which was expected to cost $132.00, with her personal credit card. (Scott's Alamo Contract, Def.'s Ex. 4.)

At the time Scott rented the car, it was not authorized under her travel orders, but the parties dispute whether, had the accident not occurred, the orders would have been amended. On previous occasions, travel orders that initially provided that a rental car was not authorized were later amended to permit the rental of a vehicle. (Scott Dep. 48:21–49:12, 76:20–77:9; Wilson Dep. 25:17–26:7; Cannon Dep. 24:17–25:11.) Indeed, Cannon's May 20, 2005, travel orders for the meeting did not authorize him to rent a car, but, on June 24, the orders were amended to authorize a rental car. At BWI, Cannon rented a car, which he used to transport multiple people to and from the airport, and he was reimbursed for the cost of the rental. (Cannon Travel Voucher, Def.'s Ex. 13, at US 00314–17; Wilson Dep. 39:8–39:14; Cannon Dep. 39:3–39:13.) Scott's travel orders, however, were never amended, and she did not request or receive

reimbursement for her rental car.  In her deposition, she claimed she failed to request reimbursement because she was involved in the accident, but she insisted she would have received reimbursement had she requested it.  (Scott Dep. 53:20–54:4, 74:2–75:2.)  Nevertheless, she acknowledged that in prior instances in which she was reimbursed for a rental car not initially authorized under her travel orders, she had used it to transport multiple people or perform a job-related task.  (*Id.* at 99:8–100:4.)

Unlike Cannon, Scott did not use her rental car to transport other attendees to the conference.  Rather, after renting a car at BWI at 1:34 p.m. (Scott's Alamo Contract, Def.'s Ex. 4), she proceeded directly to Baltimore's Inner Harbor to sightsee and shop.  Between 5:00 and 5:30 p.m. that afternoon, Scott left Baltimore and began to drive to Annapolis.  Encountering heavy traffic, she decided to stop at the Fort Meade PX, to which she had access because her husband was a member of the military.  She did not purchase anything while there, and at no point after leaving BWI did she purchase any supplies for the RRC meeting or perform any other job-related task.  (Scott Dep. 60:16–62:15.)  She left Fort Meade shortly after 9:00 p.m., intending to drive to the Radisson Hotel in Annapolis.  At approximately 9:30 p.m., while attempting to turn into a parking lot to look at a map, she drove directly in front of Kerns's motorcycle.  (*Id.* at 63:3–67:15.)  Kerns later died from his injuries.

After the accident, Scott took a taxi to the Radisson in Annapolis.  She was too upset to participate in the meeting, so the following morning she took a taxi to BWI and returned to Pittsburgh.  (*Id.* at 69:11–70:6.)  Subsequently, she requested and received reimbursement for the mileage between her home and the Pittsburgh airport and the cost of the taxis to and from the Radisson.  She was not reimbursed for the rental car.  (Scott Travel Voucher, Def.'s Ex. 7, at US 00287–92.)

4

Ms. Kerns brought suit against the United States on April 19, 2007. On February 2, 2008, this court granted the defendant's motion to dismiss for lack of jurisdiction on the grounds that the plaintiff failed to show Scott was acting in the scope of her employment, as required under 28 U.S.C. § 1346(b). The Fourth Circuit, on appeal, held that this question was sufficiently intertwined with the merits that the plaintiff should be permitted to conduct discovery. *See Kerns v. United States*, 585 F.3d 187 (4th Cir. 2009). Having now completed discovery, both parties move for summary judgment.

STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1] The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *Id.* at 248.

"A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (internal quotation marks and citation omitted) (alteration in original).

---

[1] The United States has moved to dismiss pursuant to Rule 12(b)(1) or for summary judgment. The Fourth Circuit held that, in this context, dismissal under Rule 12(b)(1) is inappropriate. *Kerns*, 585 F.3d at 192. Therefore, I will consider this as a motion for summary judgment.

5

The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655, 82 S. Ct. 993 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

ANALYSIS

Where a plaintiff has been injured as a result of the tort of a federal employee acting within the scope of her employment, the United States is liable under the FTCA to the extent a private person in the same position would be liable under state law. 28 U.S.C. § 1346(b); *FDIC v. Meyer*, 510 U.S. 471, 477, 114 S. Ct. 996 (1994). Here, the plaintiff asserts that, under Maryland law, the United States is vicariously liable for Scott's negligence. In Maryland, "[t]he doctrine of *respondeat superior* . . . allows an employer to be held vicariously liable for the tortious conduct of its employee when that employee was acting within the scope of the employment relationship." *Oaks v. Connors*, 339 Md. 24, 660 A.2d 423, 426 (1995) (citations omitted). The only question presented at this time, therefore, is whether Scott was acting within the scope of her employment when the accident occurred.

Generally, Maryland courts will find an employee's tortious acts to be within the scope of her employment if "they were in furtherance of the employer's business and were 'authorized' by the employer." *Sawyer v. Humphries*, 322 Md. 247, 587 A.2d 467, 470 (1991). In the context of automobile accidents, however, this rule has been narrowed:

> "It is now held by the great weight of authority that a master will not be held responsible for negligent operation of a servant's automobile, even though engaged at the time in furthering the master's business unless the master expressly or impliedly

6

> consents to the use of the automobile, and . . . had the right to control the servant in its operation, or else the use of the automobile was of such vital importance in furthering the master's business that his control over it might reasonably [be] inferred."

*Oaks*, 660 A.2d at 426 (quoting *Dhanraj v. Potomac Elec. Power Co.*, 305 Md. 623, 506 A.2d 224, 226 (1986)) (omission and alteration in original). Otherwise stated, a plaintiff may successfully invoke the doctrine of *respondeat superior* only if "an employer has either expressly or impliedly . . . authorized the [employee] to use [the] vehicle in the execution of his duties, and the employee is in fact engaged in such endeavors at the time of the accident." *Id.* at 427 (internal quotation marks, emphasis, and citations omitted).

The evidence here cannot reasonably give rise to an inference that the government authorized Scott to use a rental car during the conference. Her travel orders explicitly stated that a rental car was not authorized. Although it was not uncommon for orders to be amended, there is no reason to believe this would have occurred with Scott's orders. Notably, the orders for the other RRC staff member to rent a car, Cannon, had already been amended to authorize the rental of a car. It is not reasonable to infer that RRC commanders altered Cannon's orders on the morning of June 24th but decided to wait until after the conference to similarly amend Scott's travel orders. Furthermore, Scott's insistence that she would have been reimbursed by the government for the rental car is belied by the fact that she never requested reimbursement for the car, while she did submit and receive reimbursement for the taxi rides to and from the Radisson. In light of the instruction in her travel orders that reimbursement would be capped by the "least costly service which would have permitted satisfactory completion of the mission," a fact-finder could not reasonably conclude that, after opting to fly rather than drive to the meeting, Scott would be authorized to rent a car solely for her own use. (Scott Travel Voucher, Def.'s Ex. 7, at US 00290.) Scott's rental car was expected to cost $132.00, more than double the $58.00 that

7

the Super Shuttle would have charged to transport one person to and from the airport. For a rental car to be cost effective, as was required by the travel orders, it would be necessary for the car to be used to transport multiple people—as occurred with Cannon's car. Indeed, Wilson and Cannon attested that they did not expect each person flying into BWI to rent his or her own vehicle. (*See* Wilson Dep. 52:18–53:3; Cannon Dep. 38:20–39:11.) The evidence permits no genuine dispute as to whether Scott's rental car was authorized by the government; it was not.

Moreover, even if one could reasonably conclude that the rental car was authorized, summary judgment for the government would be appropriate because Scott was not actually engaged in executing job-related duties at the time of the accident. *Oaks v. Connors*, 660 A.2d 423, is instructive as to when Maryland courts consider an employee to be "actually performing . . . designated job responsibilities." *Id.* at 427. While driving to work, Oaks was involved in an accident with the plaintiff, who sued Oaks's employer on a theory of vicarious liability. *Id.* at 425. The Maryland Court of Appeals concluded that the employer was not liable because, although it "required Oaks to have a vehicle available for use in the execution of his duties," his only job assignments were related to providing security to automated teller machines, and he was not performing this type of task at the time of the accident. *Id.* at 427. In the present action, Scott's job-related duties were limited to performing administrative tasks and training RRC volunteers. (*See* Scott Dep. 18:3–21:9.) She was not engaged in these duties at the time of the accident. She had not been instructed to go to Baltimore or Fort Meade by her superiors, and she was not shopping for anything related to the conference. (*Id.* at 91:18–92:10.) The mere fact that she was driving towards Annapolis to attend the RRC meeting is not sufficient to find that she was engaged in the execution of job-related duties.

8

The Maryland Court of Appeals has also emphasized the importance of "[t]he 'right to control' concept . . . to a *respondeat superior* analysis in the motor vehicle context." *Oaks*, 660 A.2d at 426–27. The RRC, however, had no control over Scott's use of the rental car. It dictated neither her route nor her means of transportation. *See Dhanraj*, 506 A.2d at 227 (concluding that an employer was not vicariously liable for its employee's automobile accident, which occurred while he was traveling to a training course, even though the employer paid a travel allowance because the employee "could travel to and from the facility as he pleased, by any means or route he chose" and the employer's "only concern was that he take the course, not how he got there"); *Sheets v. Chepko*, 83 Md. App. 44, 573 A.2d 413, 416–17 (Ct. Spec. App. 1990) (finding "no indication" that an employer controlled an employee while he was driving to work where the employee "could take any route and any means of transportation"). Indeed, Scott traveled north to Baltimore from BWI—away from Annapolis—before she stopped at Fort Meade and, finally, departed for the Annapolis Radisson. She also rented her own car, despite being encouraged by her employer to take the Super Shuttle or share a vehicle with other conference attendees. In view of these facts, Scott's employer did not have the requisite "right of control" to impose vicarious liability.

The plaintiff urges that this case is indistinguishable from *Regal Laundry Co., Inc. v. A.S. Abell Co.*, 163 Md. 525, 163 A. 845 (1933), mandating the imposition of vicarious liability. In *Regal Laundry*, however, a Baltimore Sun reporter was involved in an accident while returning to Baltimore from a meeting on which he was assigned to report. The Court of Appeals held that the Sun had implicitly authorized the use of the reporter's personal automobile because his editor knew the reporter would be driving to and from the meeting and the reporter received reimbursement for his mileage. *Id.* at 847. It also found that the reporter was still engaged in the

execution of his duties, which included returning to the Sun's headquarters in Baltimore for a new assignment, at the time of the accident and that there was "no deviation from the route or instructions" by the reporter. *Id.* at 848. Here, in contrast, Scott's use of the automobile was not authorized, and she did not receive reimbursement. Further, she did not proceed directly from BWI to the meeting site, but rather deviated from a direct route so that she could sightsee in Baltimore and shop at Fort Meade. The facts here are distinct from those present in *Regal Laundry*, and it is not controlling.

The plaintiff further contends that this court should import the traveling-employee, *see Mulready v. Univ. Research Corp.*, 360 Md. 51, 756 A.2d 575 (2000), and special-mission, *see Coats & Clark's Sales Corp. v. Stewart*, 39 Md. App. 10, 383 A.2d 67 (Ct. Spec. App. 1978), doctrines from workers' compensation cases to find that Scott was acting within the scope of her employment for vicarious liability purposes. As explained in this court's prior opinion in this case, under Maryland law, "an 'analysis of scope of employment for workers' compensation purposes is not apposite to the analysis of scope of employment for establishing liability under *respondeat superior*,'" which is a narrower test. *Kerns v. United States*, 534 F. Supp. 2d 633, 639 (D. Md. 2008) (quoting *Henderson v. AT&T Info. Sys., Inc.*, 78 Md. App. 126, 552 A.2d 935, 941 (Ct. Spec. App. 1989)), *rev'd on other grounds*, 585 F.3d 187. Maryland courts, including the Court of Appeals, have declined to apply workers' compensation doctrines in analyzing the vicarious liability of an employer for its employees' acts. *See, e.g.*, *Dhanraj*, 506 A.2d at 227–28; *Henderson*, 552 A.2d at 941.[2]

---

[2] The plaintiff argues that this court should certify questions of state law—including questions regarding the applicability of scope-of-employment doctrines from workers' compensation cases to cases of vicarious liability—to the Maryland Court of Appeals rather than granting the defendant's motion for summary judgment. The "available state law," however, is not so "insufficient" that certification is appropriate in the present action. *Roe v. Doe*, 28 F.3d 404, 407

10

In sum, the only reasonable inference supported by the evidence is that Scott was not acting within the scope of her employment at the time of the accident. Accordingly, judgment will be entered in favor of the defendant.


March 28, 2011                                                        /s/
Date                                                         Catherine C. Blake
                                                             United States District Judge

---

(4th Cir. 1994). The Maryland Code permits the Court of Appeals to answer questions certified to it only if "there is no controlling appellate decision," Md. Code Ann., Cts. & Jud. Proc. § 12-603, and as discussed above, Maryland appellate courts have rejected the application of these doctrines in vicarious-liability cases. *See Sheets*, 573 A.2d at 418 ("[I]n *Dhanraj,* the Court of Appeals specifically rejected the application of principles of Worker's Compensation to a determination of whether a particular activity was within the scope of employment for purposes of establishing vicarious liability of an employer."); *see also Buckingham v. United States*, 124 F. Supp. 2d 943, 944–45 (D. Md. 2000) (declining to certify to the Maryland Court of Appeals a question regarding the applicability of the special-mission doctrine in the *respondeat superior* context).